**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 14-80190-CIV-HURLEY**

**GLOBAL DIGITAL SOLUTIONS, INC.,**

     **Plaintiff,**

**vs.**

**MERRIELLYN KETT MURPHY,**

     **Defendant.**

_____/

**OPINION AND ORDER DENYING DEFENDANT'S AMENDED**
**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**
**&**
**DENYING ALTERNATIVE MOTION TO TRANSFER VENUE [ECF NO. 52]**

**Preface**

Plaintiff, Global Digital Solutions, Inc. ("GDSI") has filed an amended complaint against defendant Merriellyn Kett Murphy ("Kett") alleging claims for tortious interference with contract (Count 1), fraudulent inducement to contract (Count 2), fraudulent concealment (Count 3) and civil conspiracy (Count 4).

The case is now before the court on Kett's amended motion to dismiss GDSI's amended complaint for lack of personal jurisdiction, or alternatively, for transfer of the case to the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1404, and further motion to dismiss the tortious interference, fraudulent concealment and civil conspiracy claims for failure to state a claim on which relief may be granted [ECF No. 52]. Having carefully reviewed the defendant's motion in conjunction with the plaintiff's response in opposition [ECF No. 53] and the defendant's reply [ECF No. 54], the court has determined to deny the motion in all respects.

# I.   Standard of Review

When a defendant moves to dismiss for lack of personal jurisdiction, an evidentiary hearing is not required.  *Melgarejo v. Pycsa Panama, S.A.*, 537 Fed. Appx. 852 (11th Cir. 2013),  citing *Mutual Service Ins. Co. v. Frit Industries, Inc.*, 358 F.3d 1312, 1319 n. 6 (11th Cir. 2004).  When the court does not hold a hearing, the plaintiff must establish  a *prima facie* case of personal jurisdiction by presenting "sufficient evidence by way of  affidavits or deposition testimony to survive a motion for a directed verdict."  *Id*.  If the plaintiff makes a *prima facie* case for personal jurisdiction, the defendant then must raise, through affidavits, documents or testimony, a meritorious challenge to personal jurisdiction; if the defendant does so, the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents.  *Internet Solutions Corp. v. Marshall*, 557 F.3d 1293 (11th Cir. 2009).   The court must construe the allegations in the complaint as true if they are not contradicted by the defendant's evidence; when there is conflicting evidence, the court must construe all reasonable inferences in favor of the plaintiff.  *Frit*, 358 F.3d at 1319.

In determining whether the exercise of personal jurisdiction of a non-resident defendant is proper, a two-step inquiry applies.  *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1166 (11th Cir. 2005).  First, the court examines whether exercise of jurisdiction over the non-resident defendant would satisfy the requirements of the state long-arm statute.  *Meier ex rel Meir v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1269 (11th Cir. 2002).  Second, the court examines whether exercise of personal jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *Id*.  The due process inquiry traditionally requires the court to determine whether the defendant has sufficient "minimum contacts" with the forum state so as to satisfy "traditional notions of fair play and substantial justice.

*Burger King Corp. v. Rodzewicz*, 471 U.S. 462, 472-73, 105 S. Ct. 2174, 85 L. Ed.2d 528 (1985);

*Madara v. Hall*, 916 F.2d 1510, 1516 n. 7 (11th Cir. 1990); *Consolidated Dev. Corp. v. Sherritt, Inc.,*

216 F.3d 1286, 1292 (11th Cir. 2000); *Cable/Home Communication v. Network Products,* 902 F.2d

829 (11th Cir. 1990).

Recognizing that GDSI, as plaintiff, has the burden of establishing a *prima facie* case of

personal jurisdiction under these requirements,  *Meier ex rel Meier v. Sun Int'l Hotels, Ltd*, 288 F.3d

1264 (11th Cir. 2002), the court now applies these standards to the evidence in this case.

## II.  Facts[1]

GDSI is a New Jersey corporation with principal place of business in West Palm Beach, Palm

Beach County, Florida, engaged in the acquisition of small arms manufacturers and related

companies.  Airtronic, USA, Inc. ("Airtronic") is an  Illinois corporation and manufacturer of small

arms which supplies weapons to the United States military and occasionally to private federal agency

customers.  Airtronic's approved weapons include grenade launchers, rocket launchers, assault rifles

and machine guns. Defendant Kett is the sole shareholder, CEO, President and Chairman of the

Board of Directors of Airtronic.

In March, 2012, unsecured creditors forced Airtronic into an involuntary bankruptcy under

Chapter 7 proceedings initiated in the U.S. Bankruptcy Court in the Northern District of Illinois.

After the Bankruptcy Court converted the case into a Chapter 11 proceeding, Kett began negotiating

with GDSI to acquire the financial assistance needed for Airtronic to emerge from bankruptcy.

In August, 2012, GDSI entered into a letter of intent with Kett as CEO and sole shareholder

---

[1] The recited facts are drawn from the plaintiff's amended complaint [ECF No. 47], which, for purposes of this motion the court accepts as true, to the extent uncontroverted by the defendant's proofs, along with the jurisdictional proofs submitted by both parties.

of Airtronic, agreeing to provide financial assistance in exchange for an equity stake in Airtronic.  In October, 2012, GDSI and Airtronic entered into a Merger Agreement entitling GDSI to acquire 70% of Airtronic in exchange for cash, common stock and other consideration.  The pending merger was scheduled to close on November 18, 2013, and required to close before December 2, 2013 per order of the bankruptcy court confirming the reorganization plan.

During the course of merger negotiations, Kett represented to GDSI that Airtronic needed additional funds as working capital in order to continue operations through the closing date outlined in the pending Merger Agreement.  Relying on Kett's affirmations of commitment to the merger, in January 2013, GDSI began a series of wire transfers to Airtronic from its Florida bank account, ultimately loaning Airtronic a total of $1,406,173.58 in bridge loans over an extended period of time. A portion of this funding went directly to pay Kett's personal salary.

Further, during the course of merger negotiations, Kett made three trips to Florida to meet with GDSI and its representatives, and made numerous telephone calls to GDSI and its representatives in Florida, consistently indicating her intent to go forward with the merger, all while continuing to accept incremental operational funding on behalf of Airtronic.

According to GDSI, Kett intentionally delayed the merger by making unreasonable demands related to her personal employment agreement, going so far as to ask Southport Bank, Airtronic's most senior creditor in the bankruptcy proceeding, to tell GDSI that it would refuse to approve the merger unless GDSI agreed to Kett's demand for a three-year personal employment contract.  Kett also discussed her personal employment agreement with GDSI representatives on numerous occasions, by way of in-person Florida meetings, telephone conferences and emails.  When Kett traveled to Florida to meet with GDSI representatives on April 17, 2013, she once again discussed

4

personal employment requirements which would attend the merger.  Ultimately, on August 5, 2013, GDSI approved a new employment agreement that met Kett's employment demands and was designated to take effect on the same date as the effective date of the GDSI/Airtronics merger.

At some point during the course of negotiations with GDSI, Kett became unhappy with GDSI's demands and started to privately seek out other prospective merger partners and to actively look for ways to break the pending GDSI merger.  According to GDSI, Kett began seeking out other prospective partners at least as early as October 21 – 23, 2013, when Kett attended the annual meeting and exposition of the Association of the United States Army on behalf of Airtronic.  At that conference, Kett met Joan Meyers and Sgt. Major Randall Williams, the principals of Strategic Link Partners, and engaged them in a discussion of alternative equity financing for Airtronic.  Kett thought Meyers could help her find a new investor for Airtronic that "understood the defense business" and would provide her with a better post-merger personal employment opportunity.  On October 25, 2013, Kett signed a non-disclosure agreement on behalf of Airtronics with Strategic Link Partners, and, on that same day, Myers introduced her to Wendell McCain of Onset Capital Partners ("Onset").

Kett did not notify GDSI that she was exploring other financing options and business combinations with McCain and Onset at this juncture.  On October 29, 2013, she flew to North Carolina to meet with McCain, Onset and Strategic Link Partners representatives, again without notifying GDSI of this meeting.  At that meeting, she complained to McCain that GDSI had stopped funding Airtronic; contrary to this suggestion, however, on the following day, October 30, 2013, GDSI sent a money wire from its Florida bank account to Airtronic in the amount of $65,012.74, a portion of which went directly to paying Kett's personal salary.

On October 31, 2013, Kett sent McCain an email from her personal Yahoo email account complaining about new contract terms that GDSI was insisting upon, while inviting Onset to make an alternative offer and break the pending merger. After forwarding a copy of the "absolute final versions" of the pending merger agreement between Airtronic and GDSI, Kett complained to McCain about the terms and actively courted a better offer from Onset:

> Wendell….GDSI is asking me to agree to this materially changed deal by November 12, a deal which no longer contains even one share in payment for my 100% interest in Airtronic. In order to get the creditors to agree to the plan, I waived any claim to the $703,000 I had loaned the company. GDSI says they are not committing to providing any working capital, and the $1.25 million in working capital in the original merger documents has been committed to buy shares for the creditors. They say there is no working capital left.
> ….
> The Irish have a proverb, Revenge is a dish best eaten cold. I hope you do invest in Airtronic. It would be a quiet pleasure to listen to them howl. Just to keep some psychic balance in the world, do invest. I will work my tail off for you. We'll get the [redacted]. I know there's an unreasonably short time period in which to act – maybe as little as ten days. But if you want in and if you're liquid, GDSI has handed you an opportunity to unzip the deal. My God, they've changed the terms of the deal to such an extent I don't see how they have a cause of action if they are replaced. I doubt if the court will approve it…..
>
> I expect you're wondering about the company I keep. It's not that I was fooled… I thought that if I kept things rolling, I would attract a real investor who understood the defense business. I hope it's you.

[ECF No. 47-6].

On October 31, 2013, Kett sent McCain another email from her personal Yahoo email address stating that McCain should become the "white knight," a term that refers to someone who acquires ownership in a portion of a corporation to prevent someone else from purchasing or taking over the corporation.

On October 31, 2013, Kett also sent at least three emails to GDSI in Florida from her corporate Airtronic email account which outlined the status of various orders that were pending and invoicing for outstanding orders.  She also offered to give potential investors a presentation about Airtronic on behalf of GDSI.  According to GDSI, Kett sent this series of emails to create the façade of Airtronic's intent to proceed with the merger, in order to induce GDSI to continue its interim operational funding of Airtronic, all while Kett covertly worked on setting up an alternative deal with Onset and others.

On November 3, 2013, Kett sent GDSI an email acknowledging her receipt of the merger closing documents, stating that she had an attorney looking at them.  GDSI alleges that this email was intended to stall GDSI while Kett continued to negotiate for a better deal with Onset and other investors.  On November 5, 2013, Kett had a ten minute telephone conversation with GDSI representatives in Florida regarding the anticipated merger, with no mention of Onset's involvement or Kett's intention to seek out other investors.  On that same day, Kett had dinner in Chicago with McCain (Onset), Scott Pearce from BPI Development, Toure Claiborne from Kearney Park Investors and Attorney Stahl, Airtronic's bankruptcy counsel, who was actively involved in both the GDSI and Onset deals.

On November 5, 2013, McCain prepared a confidential memorandum to potential investors in Airtronic, outlining Onset's intention to extinguish GDSI funding and to invest $5 million from Onset in exchange for a mix of debt and equity.

On November 6, 2013, GDSI sent another wire transfer from its Florida bank account to Airtronic in the amount of $26,626.38.  Also on November 6, 2013, Kett privately met with Onset, Pearce and Claiborne at Airtronic offices, and again falsely represented that GDSI had stopped

funding Airtronic.  By the next day, November 7, 2013, Kett had designated a new "hopeful corporate counsel," Attorney William Rudnick, who was designated to serve if Airtronic completed the merger with Onset and Kearney.

On November 8, 2013, Kett participated in a conference call with Attorney Rudnick, as well as Attorney Stahl, Claiborne and Onset representatives, addressing the pending GDSI merger and the formulation of strategies to terminate it.  According to the notes from participants to that call, the group members determined that they were "not in a position to terminate the GDSI merger agreement," and felt they needed a new plan of reorganization if the "home team [i.e. Onset/Airtronic /Kearney] is going to be in the deal and show up at the courtroom with a deal."

On November 8, 2013, Kett met Claiborne in Chicago.  In follow up, Claiborne issued an email to McCain (Onset) and Attorney Rudnick outlining and contrasting what Kett would personally get under the employment agreement contemplated with the GDSI merger, as opposed to what she would personally receive under the employment agreement contemplated with the Onset/Kearney merger.

On the same day she concluded the new 'team" conference call, November 8, 2013, Kett also exchanged eight emails with GDSI principals, again giving all appearances of an intent to proceed with the merger on behalf of Airtronic.

On November 11, 2013, when Kett fell silent in response to various GDSI communications, GDSI filed a motion to compel the closing of the merger.  Kett forwarded the motion to McCain, Claiborne, Pearce and Link Strategic Partners, stating, "Time is short.  They've gone to the court."

On November 13, 2013, GDSI's attorney sent Kett an inquiry about the logistics of using a Delaware subsidiary for the merger agreement, and Kett indicated in response that she would refer

8

the matter to Attorney Stahl.  On that same day, Kett forwarded the final GDSI closing documents to Attorney Rudnick and McCain, stating, "These are the documents GDSI wants me to sign during the merger on Monday.  If Wendell (McCain) and Toure and Scott are serious about financing, then I hope you will help."

On November 15, 2013, Airtronic announced, through counsel that it did not intent to proceed with the GDSI merger. On December, 2, 2013, Airtronic reverted back to the status of Debtor in Possession under Chapter 11 due to its failure to execute the Merger Agreement and complete the Amended Plan of Reorganization within sixty days of its confirmation by the bankruptcy court.

According to GDSI, Kett never intended to close the GDSI/Airtronic merger, but instead simply worked to exploit GDSI and its principals as a means of securing $1.5 million in interim financial support to fund her own personal salary and other benefits during the pendency of Airtronic bankruptcy reorganization proceedings, while she simultaneously searched for another more lucrative partner.  Ultimately, Kett entered into a separate merger agreement on behalf of Airtronic with Kearney Park Investments, LLC and Onset Capital Partners.

On this predicate, GDSI sues Kett individually for tortious interference with contract and advantageous business relationship (interference with the Airtronic/GDSI Merger Agreement) fraudulent inducement to contract (inducing GDSI to loan money based on false representations regarding Airtronic's intent to proceed with the merger), fraudulent concealment (failing to advise GDSI of her ongoing discussions with other prospective merger partners) and civil conspiracy.

### III.  Discussion

### A.  Personal Jurisdiction – Florida Long-Arm Statute

Florida's long-arm statute provides for both general and specific personal jurisdiction. §§ 48.193(1), (2), Florida Statutes.  General jurisdiction refers to the power of a court to adjudicate any cause of action involving a particular defendant if that defendant engaged in "substantial and not isolated" activity within Florida, regardless of whether the claim asserted arose from that activity. *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264 (11th Cir. 2002).  In other words, general jurisdiction is based on a defendant's contacts with the forum state that are not necessarily related to the cause of action litigated.  *Consol. Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1293 (11th Cir. 2000).  It requires a showing of "continuous and systematic" general business contacts within the state, *Trustees of Columbia University v. Ocean World, S.A.,* 12 So.3d 788, 792 (Fla. 4th DCA 2009), which may be found where a nonresident's activities are extensive and pervasive, in that a significant portion of the defendant's business operations or revenue derived from established commercial relationships in the state, or where a defendant continuously solicits and procures substantial sales in Florida.  *Id.*

In contrast, specific jurisdiction exists where the plaintiff's cause of action arises from or is directly related to the defendant's contacts with the forum state.  *Oldfield v. Pueblo de Bahia Lora, S.A.,* 558 F.3d 1210, 1221 n. 27 (11th Cir. 2009); *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 n. 3 (11th Cir. 2006); *Consolidated Dev. Corp. v. Sherritt, Inc*., 216 F.3d 1286 (11th Cir. 2000).  The requirement that the plaintiff's cause of action must "arise from" the defendant's activities is broader than the concept of "proximate cause," and is satisfied by

10

a showing of some "direct affiliation, nexus, or substantial connection between the cause of action and the [defendant's ] activities within the state." *Sun Trust Bank v. Sun Int'l Hotels, Ltd*, 184 F. Supp. 2d 1246, 1269 (S.D. Fla. 2001).

In this case, GDSI asserts specific jurisdiction under the "tortious act within Florida" provision of Florida's long-arm statute, § 48.193(1) (a) (2), which provides that a nonresident defendant is subject to personal jurisdiction in Florida "for any cause of action arising from ... [c]ommitting a tortious act within [Florida]," or, alternatively, the "doing business in Florida" provision of the long-arm statute, § 48.193 (1) (a) (1), which provides that a nonresident defendant is subject to personal jurisdiction in Florida "for any cause of action arising from … operating, conducting, engaging in, or carrying on a business or business venture in this state…."

## 1.  Committing a Tort in Florida

Under Florida law, a non-resident commits a tortious act "within Florida" when he commits an act outside the state that causes injury within the state. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013), *citing Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008).  For purposes of this statute, the defendant does not have to be physically present in Florida for the tortious act to occur "within" the state. *Internet Solutions Corp. v. Marshall*, 557 F.3d 1293 (11th Cir. 2009), citing *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002).  Thus, "committing a tortious act" within the meaning of this provision may be accomplished via "telephonic, electronic, or written communications into Florida," so long as the cause of action arose from those communications, and, under certain circumstances, such communications can also satisfy due process requirements.  *See also Swanky Apps, LLC v. Roony Invest & Finance, S.A.,* 126 So.3d 336 (Fla. 3d DCA 2013); *OSI Industries, Inc. v. Carter*, 834 So.2d 362 (Fla. 5th DCA 2003).

11

That is, under the Florida long-arm statute, a distinct connection between the defendant's communication and the alleged tort is required to sustain specific jurisdiction under this provision. This requires that the communications directed into the state must themselves be tortious (e.g. defamatory or libelous), *see e.g. Achievers Unlimited, Inc., v. Nutri Herb, Inc*., 710 So.2d 716, 618 (Fla. 4th DCA 1988), or fraudulent. *See e.g. Deloitte & Touche v. Gencor Industries, Inc*., 929 So.2d 678 (Fla. 5th DCA 2006). Conversely, where none of the alleged causes of action would depend on proof of either the existence or content of the communications from the non-resident into Florida, personal jurisdiction will not lie. *Mellennium Industries Network, Inc. v. Hitti*, 2014 WL 324656 (S.D. Fla. 2014). This follows because § 48.193(1) (a) (2) requires a sufficient nexus between the cause of action and the non-resident defendant's in-state contacts. *Wendt v Horowitz,* 822 So.2d 1252, 1260 (Fla. 2002).

Here, GDSI maintains that Kett made numerous telephone calls to plaintiff in Florida falsely representing her intent to proceed with the GDSI merger, when, in fact, she was secretly negotiating with other potential investors with the hope of breaking the GDSI merger. For example, on November 5, 2013, she talked to GDSI on the phone for over ten minutes, creating the appearance of being on board with GDSI in order to induce GDSI to make another wire transfer (which came the next day), when on that same day she had already talked to representatives of Onset and Kearney soliciting their investment and a better personal employment deal for herself. In addition to the November 5, 2013 phone call, Kett sent numerous emails to GDSI in Florida suggesting an intent to proceed forward with the merger, in order to maintain the GDSI funding, on October 23, 2013; October 31, 2013; November 1, 2013; November 3, 2013; November 8, 2013; and November 13,

2013, while she continued to secretly court Onset, Kearney and others for a better deal  [Amended Complaint 86, 88, 90, 113, 124].

With this, GDSI shows the existence of communications directed into state – specific emails and telephone communications – which directly related to or played a role in the alleged fraudulent scheme to divest GDSI of its money or to interfere with the GDSI/Airtronic Merger Agreement. Accordingly, GDSI sufficiently adduces facts in support of personal jurisdiction over Kett under the "committing a tortious act" subsection of the Florida long-arm statute.  *Compare Consolidated Energy Inc. v. Strumor*, 920 So.2d 829 (Fla. 4th DCA 2006) (telephone communications between non-resident agent and instate corporate representative in connection with company pledge of stock to secure a loan did not provide basis for exercise of personal jurisdiction over agent, where communications did not give rise to company's causes of action).

## 2.   "Doing business" in Florida

As to GDSI's alternative contention that jurisdiction may be sustained against Kett for "doing business" in the State of Florida, based on her active solicitation of nearly $1.5 million from GDSI in Florida during the course of her negotiation of the Airtronic/GDSI Merger Agreement - an act ostensibly performed for the benefit of Airtronic - Kett invokes the corporate shield doctrine as basis for resisting the exercise of personal jurisdiction.

Under the corporate shield doctrine, the acts of a corporate employee performed in his corporate capacity cannot form the basis for jurisdiction over the corporate employee in his individual capacity.  *Schwartzberg v. Knobloch,* 98 So.3d 173 (Fla. 2d DCA 2012); *Doe v. Thompson*, 620 So.2d 1004, 1006 (Fla. 1993) ("it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are  acts performed

not for his own benefit but for the benefit of his employer"). However, there is an exception to the corporate shield doctrine which limits the scope of the doctrine's protection: a corporate officer who directs fraud or other intentional misconduct committed outside the state toward parties inside the state may be subject to personal jurisdiction. *Kitroser v Hurt*, 85 So.3d 1084 (Fla. 2012). In other words, the corporate shield doctrine is inapplicable where a corporate officer commits intentional torts aimed at the forum state. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (Fla. 2013); *United Credit Recovery LLC v. Bexten,* 2012 WL 750299 (M.D. Fla. 2012).

In this case, GDSI alleges that Kett solicited a total of $1.5 million in bridge loans from GDSI in Florida in order to obtain operational funding for Airtronic during bankruptcy reorganization proceedings, while she had no intention of proceeding with the GDSI merger and while she actively worked to covertly seek out alternative and more lucrative business partners for the company. In other words, the complaint alleges intentional fraud-based torts committed by a person outside the state and directed to a person inside the state, resulting in the transfer of $1.5 million in bridge loans directed by a Florida resident from a Florida bank. GDSI's evidentiary submissions offer further circumstantial support for the suggestion that Kett induced GDSI to make these payments under the false pretense that she intended to proceed with the merger on behalf of Airtronic.

Because the corporate shield doctrine does not apply to intentional torts calculated to cause injury in Florida, or to shield a non-resident corporate officer from his or her own fraudulent activity directed at parties in Florida, it is no impediment here to the exercise of personal jurisdiction over Kett. *See Bryon v. Marine Carriers (USA), Inc*., 668 So.2d 273, 274 (Fla. 1st DCA 1996); *Allerton v. State of Florida Dept. of Insurance,* 635 So.2d 36 (Fla. 1st DCA), *rev. den*., 639 So.2d 975 (Fla.

1994).  The allegations and circumstantial proofs regarding Kett's motive and intent during the course of the parties' bridge loan negotiations and merger agreement discussions are sufficient to provide the necessary "connexity" requirement between the business transacted in Florida. Accordingly, the corporate shield doctrine is no bar, as a matter of law, to these claims.  *Doe v Thompson*, 620 So.2d 1004, 1006 n. 1 (Fla. 1993) ("A corporate officer committing fraud or other intentional misconduct can be subject to personal jurisdiction); *McKenzie v Reuter*, 9 So.3d 770 (Fla. 4th DCA 2009).

### 3.  Due Process Considerations

Accordingly, the court must reach the next step of determining whether the exercise of jurisdiction under this prong of the Florida long-arm statute comports with the Due Process requirements of the Fourteenth Amendment to the United States Constitution.

In specific personal jurisdiction cases, the court applies a three-part due process test, which examines:  (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum;  (2) whether the nonresident defendant "purposefully availed" itself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum's state's laws, and (3) whether the exercise of personal jurisdiction comports with "traditional notion of fair play and substantial justice."  *Louis Vuitton Malletier, SA v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) and cases cited *infra*.  The plaintiff  bears the burden of establishing the first two prongs, and if it does so, the defendant must make a compelling case that the exercise of jurisdiction would violate "traditional notions of fair play and substantial justice."  *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3D 1249, 1267 (11th Cir. 2010).

Here, GDSI's tortious interference, fraud and conspiracy claims arise out of Kett's solicitation of $1.5 million in bridge loans for the benefit of Airtronics which she allegedly used for her personal benefit during extended negotiations over the GDSI/Airtronic merger and acquisition agreement, a deal which Kett, as principal of Airtronic, allegedly had no intention of consummating. There is direct causal relationship between Kett, Florida and the tort claims to satisfy the first requirement of "relatedness" under this test.

The court next addresses whether Kett purposely availed itself of conducting activity within the forum state.  In intentional tort cases, there are two tests for determining whether this element occurred.  *Louis Vuitton Malletier, SA, supra* at 1356-57.  First, the court may apply the "effects test," articulated in *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482, 79 L.Ed.2d 804 (1984) (upholding jurisdiction of California court over Florida defendants based on allegedly libelous effect of Florida conduct which was calculated to cause injury to plaintiff in California).  Under this test, a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state, but only where the tort: (1) [was] intentional; (2) [was] aimed at the forum state, and (3) caused harm that the defendant should have anticipated would be suffered in the forum state.  *Id* at 1356, citing *Lovelady* at 1285-86.

The "effects test" provides an additional means, unavailable in contract cases, of determining the appropriateness of personal jurisdiction – one that is based on a plaintiff's ties to the forum state and the harm suffered by the plaintiff.  The test does not, however, supplant the traditional minimum contacts test for purposeful availment applicable in contract and tort cases alike. *Id* at 1357. As applied to tortious interference claims, the *Calder* "effects test" requires a determination of whether the alleged tortfeasor expressly aimed his out-of-state conduct at the forum state, requiring a focus

16

on the nexus between the forum and the injured contractual relationship. *Brennan v. Roman Catholic Diocese of Syracuse New York*, 322 Fed. Appx. 852 (11th Cir. 2009) (unpub).

The court may also apply a traditional purposeful availment analysis under the traditional "minimum contacts" test. *Louis Vuitton* at 1356-57, citing *S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997) (applying traditional minimum contacts test in case involving intentional tort claims of securities fraud). Under the traditional minimum contacts test, the court assesses the nonresident's contacts with the forum state and asks whether those contacts: (1) are related to plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed itself of the privileges of doing business within the forum, and (3) are such that the defendant should reasonably anticipate being haled into court in the forum. *Id*, citing *Carrillo,* 115 F. 3d 1540,1542 (11th Cir. 1997).

In this case, the court finds the element of "purposeful availment" met under the effects test, as the allegations and jurisdictional evidence suggest the existence of fraudulent statements, made by defendant, directed at a Florida corporation and which caused injury to that corporation in Florida. *See e.g. Fetter v. North American Alcohols, Inc.*, 2007 WL 551512 (E.D. Pa. 2007).

Further, the court finds that exercise of specific personal jurisdiction over Kett in this tort action comports with traditional notions of fair play and substantial justice: Florida has a significant interest in adjudicating a dispute alleging that Kett fraudulently solicited $1.5 million in funding from a Florida business and tortiously interfered with its contractual relations; GDSI has an interest in obtaining convenient and efficient relief which is best served by litigating the case in Florida, and Kett will not be significantly burdened by litigating the case in Florida. Under the circumstances alleged, Kett had sufficient contact with Florida to have fair warning that she could be subject to suit

in Florida, and the due process requirements of fair play and substantial justice are met. *Exhibit Icons, LLC v. XP Companies, LLC*, 609 F. Supp. 2d 1282 (S.D. Fla. 2009); AXA *Equitable Life Ins. Co. v. Infinity Financial Group*, 608 F. Supp. 2d 1349 (S.D. Fla. 2009).

### B.   Failure to State a Claim

### 1.   Tortious Interference

GDSI asserts, first, a tortious interference with contract claim against Kett, contending that she intentionally and unjustifiably interfered with the Airtronic/GDSI Merger Agreement by secretly soliciting and ultimately engaging a different merger partner for Airtronic who could provide her with a better personal employment opportunity than that offered by GDSI. Kett challenges the legal sufficiency of this claim, contending that a claim for tortious interference with contract will not lie where the alleged interference is directed at a business relationship to which the defendant is a party or has an interest, including situations where, as here, the defendant has a supervisory interest in how the business relationship is conducted, or a potential financial interest in how the contract is performed. *See e.g. Palm Beach County Health Care District v. Professional Medical Education, Inc.,* 13 So.3d 1090, 1094 (Fla. 4th DCA 2009). Because the GDSI complaint on its face alleges facts suggesting that Kett had a supervisory interest in the conduct of the Merger Agreement, as well as a potential financial interest in its performance, Kett contends that GDSI can state no claim for tortious interference against her as a "stranger" to the Merger Agreement.

Even assuming, *arguendo*, that Kett was an interested third-party to the Merger Agreement on either of these theories, and thus no "stranger" to the contract, she does not yet enjoy immunity for tortious interference, however, if she, as an employee of a contracting party, acted "solely with ulterior purposes, without an honest belief that [her] actions would benefit the employer, and [her]

18

conduct concerning the contract or business relationship is not in the employer's best interest." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So.2d 381, 385 (Fla. 4th DCA 1999).  In this case, the complaint alleges facts suggesting that Kett was acting for her own personal motives in seeking out a prospective merger partner who would offer her a better personal employment opportunity, and it does allege facts making it at least debatable as to whether it was in the best interests of Airtronic to close the GDSI merger – a goal which Kett actively sought to circumvent in at least the last several weeks prior to the scheduled closing date.

The motion to dismiss the tortious interference claim shall accordingly be denied.

### 2.   Fraudulent Concealment

GDSI's amended complaint alleges, next, that Kett fraudulently concealed from GDSI that she was actively involved in the solicitation of and contract negotiations with certain third-party prospective merger partners, all in violation of a disclosure requirement incorporated in the Merger Agreement, at § 5.01(e), which provides:

> The Company [Airtronic] will not, nor will it authorize any director or authorize or permit any officer or employee or any attorney, accountant or other representative retained by it to make, solicit, or encourage any inquiries with respect to, or engage in any negotiations concerning, any Acquisition Proposal (as defined below for purposes of this paragraph).  The company will promptly advise Parent orally and in writing of any such inquiries or proposal (or requests for information) and the substance thereof.  As used in this paragraph, "Acquisition Proposal" shall mean any proposal for a merger or other business combination involving the Company or the acquisition of a substantial equity interest in it or any material assets of it other than as contemplated by this Agreement.  The company will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any person conducted heretofore with respect to any of the foregoing.

Kett moved to dismiss the fraudulent concealment count, contending that even if the alleged predicate facts were true, this activity gives rise to a breach of contract indistinguishable from the

alleged tort, such that the claim is precluded by the economic loss rule.  However, the Florida Supreme Court has recently limited application of the economic loss rule to products liability matters, *Tiara Condo Ass'n Inc. v Marsh & McLennan Cos., Inc*., 110 So.3d 399 (Fla. 2013), and in light of this authority, Kett has formally withdrawn this aspect of her challenge to the fraudulent concealment claim.  As the court rejects Kett's remaining challenge to the sufficiency of the supporting facts alleged as predicate for the fraudulent concealment claim, it shall  deny the motion to dismiss the claim for failure to state a claim on which relief may be granted.¶

### 3.   Civil Conspiracy Claim

Finally, Kett contends that the civil conspiracy claim fails because the complaint does not contain any allegations showing how the alleged co–conspirators carried out the claimed civil conspiracy, i.e. how the alleged coconspirators performed any unlawful acts.  The court disagrees, finding sufficient facts alleged to permit a fair inference that Kett's "team," consisting of Onset, Kearney, Attorney Stal and others, conferenced for the specific purpose of  discussing strategies to break GDSI's pending merger agreement with Airtronic [Amended Complaint, ¶ 125]; that Kett secretly met in person, and communicated by telephone and email, with members of this  "team" to try to formulate methods to break the merger [Amended Complaint ¶ ¶92, 102]; that each co-conspirator worked together to try to break the merger, at a time Airtronic was still receiving wire money transfers from GDSI in Florida [Amended Complaint ¶¶104-105].  With this background, the complaint alleges sufficient facts to show that Kett and her co-conspirators conspired to commit several individual independent torts (tortious interference, fraudulent concealment) relating to the Merger Agreement, and adequately states a valid cause of action for civil conspiracy.  *American Diversified Ins. Services, Inc. v. Union Fidelity Life Ins. Co*., 439 So.2d 904 (Fla. 2d DCA 1983).

### C.  Venue

The court has considered and rejected the defendant's further argument that venue of this action is more appropriately laid in the Northern District of Illinois, where Airtronic is emerging from Chapter 11 Bankruptcy proceedings, proceedings in which GDSI appears as a creditor, finding that the balance of relevant private and public factors used to determine whether transfer is justified do not tip in favor of transfer at this juncture of the proceeding.  *See Manuel v Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005) (to determine if convenience to parties and witness and interest of justice favor transfer under 28 U.S.C. § 1404, court should consider (1) convenience of witnesses; (2) location of relevant documents and relative ease of access to sources of proof; (3) convenience of the parties; (4) locus of operative facts; (5) availability of process to compel the attendance of unwilling witnesses; (6) relative means of the parties; (7) forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum, and (9) trial efficiency and the interests of justice, based on the totality of the circumstances).

### IV.  Conclusion

Based on the foregoing, it is **ORDERED AND ADUDGED**:

1.    The defendant's amended motion to dismiss the plaintiff's amended complaint for lack of personal jurisdiction is **DENIED.**

2.    The defendant's amended motion to dismiss the plaintiff's claims for tortious interference, fraudulent conspiracy and civil conspiracy for failure to state a claim is **DENIED.**

3.    The defendant's alternative motion to transfer venue of this action to the United States District Court for the Northern District of Illinois is **DENIED**.  *See e.g.*

21

*Conseal Intern. Inc. v. Econalytic Systems, Inc.*, 2009 WL 1285865 (S.D. Fla. 2008), and cases cited *infra.*

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 9th day of October, 2014.

Daniel T. K. Hurley
United States District Judge

22